UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

GRETHAKA SOLUTIONS OU,

 Plaintiff,
v.             Case No. 8:22-cv-1341-WFJ-SPF

CLICK LABS, INC.,

 Defendant.
_____/

# ORDER

  Before the Court are each party's motion for partial summary judgment on different issues (Dkts. 108, 111) together with exhibits, affidavits, and depositions, and the respective responses and reply (Dkts. 112, 114, 116 ).  After careful review of the parties' submissions, the applicable law, and the entire file, the Court concludes Defendant's motion is due to be granted and Plaintiff's motion is due to be denied.  The Court also orders mediation as stated below.

## BACKGROUND

  In this action, Plaintiff Grethaka Solutions OU ("Grethaka Solutions"), an Estonian startup company founded in 2020, sues Defendant Click Labs, Inc. ("Click Labs"), a technology service provider based in Florida, for breach of the parties' May 2020 Master Service Agreement ("Service Agreement").  Under the Service Agreement,  Click Labs agreed to develop the mobile Sextimer Online

Dating Application ("Application") on behalf of and for use by Grethaka Solutions. Grethaka Solutions desired to create a distinctive application for customers (users) to meet in person or communicate via videoconferencing.[1]

Plaintiff claims that Click Labs' work on the development of the Application contained many errors. These flaws led Plaintiff to demand access to Click Labs' source code, which was denied. Click Labs contends that the terms of the Service Agreement required Plaintiff to pay the full contract price before demanding the source code, but Plaintiff refused to continue to pay under the Service Agreement. Plaintiff takes the position that Click Labs improperly stopped work on the Application.

The Application was never completed. Plaintiff prays for compensatory damages of $88,574—the total amount paid by Plaintiff to Click Labs. Dkt. 80 at 15. (The total contract price was $150,000. Dkt. 112-1 ¶ 13.) Plaintiff also seeks consequential damages: $2,339,694 for the first two years of lost profits, and an additional $900,120 as Plaintiff's lost investment. *Id*. The damages alleged total

---

[1] The distinguishing core features of this dating application include a one-on-one encrypted video chat function "requiring that users be required to pay to be visible to other users" by pre-purchasing time. Dkt. 80 ¶ 3. Users would be allowed to earn money through receiving monetary tips from other users on the Application. *Id*. Tips would result in free time credit on the platform, and tips would also allow viewing videos and photos. *Id*. ¶ 4; Dkt. 108-1 (Dep. of Jorits) at 15–16, 26–31. Allan Jorits as the CEO of Grethaka Solutions testified at the Rule 30(b)(6) deposition about how the legalities of these ideas were never reached in the undertaking of this project. *See, e.g.*, Dkt. 108-1 at 31.

over $3.3 million. Both parties now move for partial summary judgment on different issues.

## LEGAL STANDARD

Summary judgment is appropriate when the movant demonstrates "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome" of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). A dispute is genuine if the evidence in "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (1992).

The moving party bears the initial burden of showing the absence of any genuine issues of material fact that would require a trial. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the moving party discharges its burden, then the nonmoving party must "come forward" with specific facts in the filings in the record to show there is a genuine dispute of material fact warranting a trial. *Allen*, 121 F.3d at 646 (citations omitted).

All ambiguities in the evidence must be resolved, and all justifiable inferences drawn, in the nonmovant's favor. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004). However, inferences based on speculation and conjecture are not reasonable and therefore insufficient to withstand summary judgment. *Marshall v. City of Cape Coral, Fla.*, 797 F.2d 1555, 1559 (11th Cir. 1986).

## DISCUSSION

Click Labs requests a partial summary judgment on the issue of consequential damages of lost profits and lost investments. Click Labs argues that these damages are speculative and cannot be proven with reasonable certainty.

Plaintiff seeks partial summary judgment on liability for breach of the Service Agreement and breach of the implied duty of good faith and fair dealing. Plaintiff asserts that the Service Agreement is unambiguous, and the material facts are undisputed as to the actions giving rise to Click Labs' breaches.

### I. Click Labs' Motion: Consequential Damages

In a breach of contract action, consequential damages are those proximately caused by the breach and "reasonably foreseeable by the breaching party at the time of the contracting." *Keystone Airpark Auth. v. Pipeline Contractors, Inc.*, 266

So. 3d 1219, 1223 (Fla. 1st DCA 2019) (citation omitted).  Plaintiff defends its claim to over $2.3 million in lost profits with the "Sextimer Business Plan" and the testimony of Robert Goodman.  Dkts. 114-3 (Business Plan dated 9/2021); 114-2 (Goodman report).  As to the more than $900,000 of lost investments, Plaintiff relies on the testimony of Luis Diaz-Rio concerning potential investors.

### A. Lost Profits

To recover lost profits, the plaintiff bears the burden of proving "the fact of damages and the extent of damages" with reasonable certainty.  *Kaplan v Nautilus Ins. Co.*, 861 F. App'x 798, 803–04 (11th Cir. 2021) (citing *Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1214 (11th Cir. 2006)).  A plaintiff establishes the "fact of damages" by proving that "the defendant's action caused the damages."  *Kaplan*, 861 F. App'x at 804 (citing *W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd.*, 545 So. 2d 1348, 1351 (Fla. 1989)). Once causation is shown, then the plaintiff must prove the quantity using "*some* standard by which the amount of damages may be adequately determined." *W.W. Gay*, 545 So. 2d at 1351 (emphasis added); *Messer v. E.F. Hutton & Co.*, 833 F.2d 909, 923 (11th Cir. 1987) ("Unless a plaintiff can show with reasonable certainty that the defendant's wrongful conduct proximately *caused* damages, questions of measurement never arise.").  Regardless of the standard employed, "[e]vidence pertaining to loss of

income or gross receipts, without specific evidence concerning expenses, is inadequate to prove lost profits." *Bass Venture Corp. v. Devom, LLC*, 342 So. 3d 821, 824 (Fla. 2d DCA 2022) (quotation citation omitted).

In instances such as this—where a startup company has no "track record"—the plaintiff must put forth substantial competent evidence sufficient to create a jury question as to lost profits. *W.W. Gay*, 545 So. 2d at 1351. In *W.W. Gay*, the Florida Supreme Court determined that the studies prepared by reputable economic analysts and expert testimony concerning lost profits was sufficient evidence to proceed to the jury. *Id*. This Court agrees with Click Labs that *W.W. Gay* is factually distinguishable.

First, the very legality of the "Sextimer" product is uncertain. *See supra* note 1. Unlike *W.W. Gay*, Plaintiff relies neither on expert testimony nor studies. Instead, Plaintiff touts its September 2021 business plan and the testimony of Robert Goodman. The business plan lists three ways of generating revenue: paid subscriptions, prepaid time for those users who want their profiles to be viewed, and commissions from tips paid by users who want to spend time viewing the tipped user. Dkt. 114-3 at 17–18. The plan sets forth goals, key milestones, strengths, and weaknesses, including the lack of required capital to kick-off Sextimer worldwide, lack of leadership in the online dating industry, and data privacy issues. *Id*. at 34–35. The risk analysis mentions that it is "somewhat

likely" that Plaintiff will "run out of cash before reaching break even." *Id.* at 35. Overall, the plan expresses estimates, assumptions, intentions, and hopes of the same or similar financial success experienced by established competitors in the industry, but gives no concrete assurances.

The plan is based on assumptions, which should not be used to support conclusions about lost profits unless they are reasonably certain and not "mere best case scenario predictions." *Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.*, 254 F. Supp. 2d 1239, 1247 (M.D. Fla. 2003). A business owner's unsupported beliefs about the future, untested financial success of his venture do not create a foundation for the recovery of lost profits. *See MasForce Europe, BVBA v. MEC3 Co.*, No. 8:11-cv-1814-T-24AEP, 2013 WL 12156469 (M.D. Fla. Dec. 4, 2013) (excluding damages expert's report and testimony as mere recitation of plaintiff's business plan). In short, Plaintiff's business plan, which is based on estimates and speculation, does not establish that Click Labs caused Plaintiff to suffer lost profits, much less provide reasonable certainty as to an amount.

Turning to Mr. Goodman's report and testimony, he is not an economist or an accountant, nor has he been disclosed as a damages expert. Mr. Goodman testified that his clients are startup companies that he assists with strategies and the development of financial projections. Dkt. 114-1 at 12–15. Most of Mr. Goodman's testimony and report addresses the $900,000 investment needed. *Id.* at

7

30–32; Dkt. 114-2 at 15–17.  He does not address, nor has Plaintiff pointed to any other part of the record which addresses, the alleged over $2.3 million in lost profits for the first two years.

Consequently, Plaintiff's claims are based on mere "what-ifs" such as what if Plaintiff would have procured more investors, what if the Application's questionable tipping function was accepted in certain markets, and what if the Application was profitable considering undetermined and unknown operating expenses and marketing costs.  Dkt. 108 at 13, citing *Haliburton Co. v. Eastern Cement Corp.*, 672 So. 2d 844, 847 (Fla. 4th DCA 1996) (reversing damages award for lost profits because there was no causal connection between the breaches and possible future profits lost based on unrealized future events—"[a]ll that was offered was a hope of commercial fortune hanging from a thin thread of 'what-ifs'").  These unfulfilled contingencies and expectations do not establish causation or a reasonable certainty as to amount.  The Court next addresses the "lost investments" claim.

### B. Lost Investments

Whether to consider "lost investments" as part of lost profits turns on the particular facts surrounding the investment and the expert testimony.  Potential investments are questionable initially, given that the legality of this "Sextimer"

8

product is not yet established. Plaintiff relies on a non-binding case, *Kaplan*, 861 F. Appx 798, for the proposition that lost investments equate with lost profits, but *Kaplan* presents different facts and circumstances. *Kaplan* involves a return on investments claim brought by the investors. Here, Plaintiff never received any part of the $900,000 potential investment yet seeks to recover this unrealized gain.

Additionally, an investor was never secured—at least not by Eaton Square, the apparent recruiting firm for investors. Although Plaintiff enlisted the assistance of Mr. Diaz-Rio with Eaton Square to identify interested financial support for the new dating application business, Plaintiff reserved the right to approve the Eaton Square's initial list before the investors were contacted. Dkt. 108-2 (Dep. of Diaz-Rio) at 58–59. According to Diaz-Rio, only five potential investors were on the list who expressed interest in the project. *Id*. at 60. He testified that Eaton Square twice stopped working on identifying investors because "very early in the project . . . we were told by Grethaka that they had an investor on their own." *Id*. at 60–61, 63.

Mr. Goodman was asked to determine whether Plaintiff could raise $900,000 for expanded marketing and working capital based on its current financials. *Id*. at 30–32. Mr. Goodman's report indicates that the $900,000 fundraising was the goal of Eaton Square. Dkt. 114-2 at 15–16. Specifically, the report states:

9

> [the biggest issue with Plaintiff's] business plan and investor presentation has to do with the company's financial driving assumptions with the derivative financial projections. Based on my many decades of experience, I find that the entrepreneurs are an optimistic lot. This optimism and enthusiastic exuberance by the founders of Grethaka is unfortunately reflected in their driving assumptions for how fast and how big they get in only five years and how fast and how much revenues they would be able to generate—especially in the very critical first two years.

*Id*. at 17. The report continues:

> Based on documents provided by broker-dealer Eaton Square, it appears that they had immediately identified 91 potential investors for the Grethaka $900,000 offering. Of these, Eaton Square's documents indicated that they had received at least some interest from 26 of these 91 potential investors.

*Id*. at 18. According to Diaz-Rio, however, the 90 potential investors were identified but not approved by Plaintiff and never expressed interest in the project. Dkt. 108-2 at 59. This casts severe doubt on the accuracy or veracity of what Goodman has to say.

Further, Mr. Goodman stated that the $900,000 would be used for expenses and not profits. *Id*. at 35, 38, 54. This observation alone ties this amount to costs as opposed to profits. Clearly, the testimony regarding the $900,000 reveals that it could not be considered a measure of lost profits to Plaintiff. With no reputable studies or designated damages expert on lost profits, Plaintiff has failed to show any genuine dispute of material fact concerning consequential damages to survive summary judgment.

10

## II. Grethaka Solutions' Motion: Breach of Contract and Duties

Plaintiff argues that under the terms of the unambiguous Service Agreement, and the undisputed facts, summary judgment is warranted as a matter of law on liability. To establish breach of contract under Florida law, the plaintiff must show 1) the existence of a contract, 2) a material breach, and 3) damages resulting from the breach. *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (citations omitted). The parties agree that they entered into the Service Agreement. Disagreement arises as to the second element of material breach, on which the parties do not concur with much at all.

The record in this case is replete with many genuine disputes of material facts concerning what actions constitute a breach of the Service Agreement and whether Click Labs fulfilled the duty of good faith and fair dealing in its actions. For example, the level of functionality of the Application at various times, particularly at the time the project stopped, is disputed. The significance of the timeline is disputed. Even precisely which party breached and when is disputed.

In the Court's view, resolution of these disputes of material facts would benefit from, and indeed require, a full trial. *See United States v. Certain Real & Personal Prop. Belonging to Hayes*, 943 F.2d 1292, 1297 (11th Cir. 1991) ("A trial court is permitted, in its discretion, to deny even a well-supported motion for

summary judgment, if it believes the case would benefit from a full hearing.") (citation omitted).  Ultimately, a trial court may deny summary judgment "where there is reason to believe that the better course would be to proceed to a full trial." *Anderson*, 477 U.S. at 2513–14.

Accordingly, Plaintiff's motion for partial summary judgment (Dkt. 111) is denied.  Click Labs' motion for partial summary judgment (Dkt. 108) is granted.  Plaintiff may not recover consequential damages consistent with this order.  This case will proceed to trial.

Order to Mediate:  The parties must mediate (at least half-day and Zoom is permissible) before March 24, 2024, before any mediator on the Court's website list.

**DONE AND ORDERED** at Tampa, Florida, on January 29, 2024.

_____
WILLIAM F. JUNG
UNITED STATES DISTRICT JUDGE

12